G1r1echc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                     15-CR-445 (PAE)

WALI BURGOS, JASON BENJAMIN,
JONATHAN HARRIS, COREY COOKS,
JAHNOMI BENJAMIN, DIQUINN
LACEND, KENNETH JENKINS,

             Defendants.         Conference

------------------------------x

                              New York, N.Y.
                              January 27, 2016
                              10:48 a.m.

Before:

               HON. PAUL A. ENGELMAYER,

                             District Judge

                   APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
BY:  JAMES M. McDONALD, ESQ.
    DINA McLEOD, ESQ.
    Assistant United States Attorneys

CHRISTOPHER P. MADIOU, ESQ.
    Attorney for Defendant Wali Burgos

FASULO, BRAVERMAN & DI MAGGIO LLP
    Attorneys for Defendant Jason Benjamin
BY:  LOUIS V. FASULO, ESQ.

JOSHUA L. DRATEL, ESQ.
    Attorney for Defendant Jonathan Harris

KELLEY J. SHARKEY, ESQ.
    Attorney for Defendant Corey Cooks

G1r1echc

                         APPEARANCES
                         (Continued)

PARKER & CARMODY, LLP
     Attorneys for Defendant Jahnomi Benjamin
BY:  DANIEL S. PARKER, ESQ.

CHRISTOPHER P. MADIOU, ESQ.
For ANGUS JAMES BELL, ESQ.
     Attorney for Defendant Diquinn Lacend

DANIEL S. PARKER, ESQ.
FOR DAWN CARDI, ESQ.
     Attorney for Defendant Kenneth Jenkins

G1r1echc

```
 1          (Case called)

 2          THE DEPUTY CLERK:  Counsel, please state your

 3   appearances for the record.

 4          MR. McDONALD:  Good morning, your Honor.  James

 5   McDonald and Dina McLeod for the government.

 6          THE COURT:  Very good.  Good morning.

 7          MS. McLEOD:  Good morning.

 8          MR. FASULO:  Louis Fasulo for Jason Benjamin, Fasulo

 9   Braverman & DiMaggio.  Good morning, Judge.

10          THE COURT:  One moment.  I think this will be a little

11   easier if we have Mr. Smallman call the roll in order, so I can

12   keep you straight, but I appreciate it.

13          Go ahead.

14          THE DEPUTY CLERK:  Wali Burgos.

15          MR. MADIOU:  Good morning, your Honor.  Christopher

16   Madiou for Mr. Burgos.

17          THE COURT:  Very good.  Good morning to both of you.

18   Which is Mr. Burgos?

19          Very good.  Good morning.

20          DEFENDANT BURGOS:  Good morning.

21          THE DEPUTY CLERK:  Jason Benjamin.

22          MR. FASULO:  Louis Fasulo again, Fasulo, Braverman &

23   DiMaggio, for Mr. Benjamin.

24          THE COURT:  Which is Mr. Benjamin?

25          Very good.  Good morning.
```

G1r1echc

1          DEFENDANT JASON BENJAMIN:  Good morning.

2          THE DEPUTY CLERK:  Jonathan Harris.

3          MR. DRATEL:  Good morning, your Honor.  Joshua Dratel

4     for Mr. Harris.  Mr. Harris is the fourth seat in in the front

5     row.

6          DEFENDANT HARRIS:  Good morning.

7          THE COURT:  All right.  Very good.  Good morning,

8     Mr. Dratel.  Good morning, Mr. Harris.

9          THE DEPUTY CLERK:  Corey Cooks.

10          MS. SHARKEY:  Good morning, Judge.  Kelley Sharkey for

11     Corey Cooks.  I would say Corey Cooks is in the fourth seat in

12     the front row, but I don't want to correct Mr. Dratel.

13          THE COURT:  Why don't we have Mr. Cooks raise his

14     hand, please.

15          All right.  Very good.  Good morning, Ms. Sharkey.

16     Good morning to you, Mr. Cooks.  I'm not going to resolve that

17     dispute.

18          DEFENDANT COOKS:  Good morning.

19          THE DEPUTY CLERK:  Jahnomi Benjamin.

20          MR. PARKER:  Daniel Parker on behalf of Mr. Jahnomi

21     Benjamin, who's next to Mr. Cooks.

22          THE COURT:  Good morning to you, Mr. Parker, and good

23     morning to you, Mr. Benjamin.

24          DEFENDANT JAHNOMI BENJAMIN:  Good morning.

25          THE DEPUTY CLERK:  Diquinn Lacend.

G1r1echc

1              MR. MADIOU:  Your Honor, I'm standing up for James

2      Bell, who's Mr. Lacend's attorney, with Mr. Lacend's

3      permission.

4              THE COURT:  Which is Mr. Lacend?

5              Good morning, Mr. Lacend.  Good morning again to you,

6      Mr. Madiou.

7              DEFENDANT LACEND:  Good morning.

8              THE DEPUTY CLERK:  Kenneth Jenkins.

9              MR. PARKER:  Your Honor, I'm standing in for Ms. Cardi

10     on behalf of Mr. Jenkins.  He's the second gentleman in in the

11     front row.  I've spoken to Mr. Jenkins and he consents to my

12     appearing.

13             THE COURT:  Thank you.  And I thank both counsel who

14     are standing in for other counsel for playing that role today.

15     Thank you.

16             Good morning, Mr. Jenkins.

17             DEFENDANT JENKINS:  Good morning.

18             THE COURT:  You may all be seated.

19             As I expect everyone is aware, we held an initial

20     conference in this many-defendant case on December 11th.  At

21     that time I set an overall schedule, or at least the next date

22     in the case, and I received in quite a lot of detail a report

23     about the case and about the categories of discovery from the

24     government.  It was a very helpful presentation.  At the time I

25     recognized that certain defendants either hadn't been arrested

G1r1echc

1    yet or hadn't been brought to this courthouse yet, and I asked

2    the government to coordinate with my chambers to arrange a

3    follow-up conference so that you could all physically be here

4    at a conference before me as soon as possible.  This is that

5    conference.

6          At the December 11th conference I asked Mr. McDonald

7    to make sure that a transcript of the December 11th

8    conference was provided to all of the counsel for defendants

9    who weren't physically present on December 11th.  The reason

10   was that I needed to set an overall schedule binding everyone,

11   and a lot of useful information was established at that

12   conference that he shared, and I wanted to make sure it was

13   promptly made available to defense counsel and defendants.

14         So without further ado, Mr. McDonald, have you

15   provided a copy of the transcript of the December 11th

16   conference to each of the counsel for the defendants who are

17   here today?

18         MR. McDONALD:  I have, your Honor.

19         THE COURT:  All right.  Let me ask counsel, each of

20   you, have you shared that transcript -- I'm trying to save time

21   here -- have you shared that transcript with your client?

22         MR. PARKER:  On behalf of Jahnomi Benjamin, I have,

23   your Honor.

24         THE COURT:  Has anyone not shared the transcript with

25   their client?

G1r1echc

1          MR. DRATEL:  I'm in the process of sending it, your

2     Honor.  I'm just catching up on a large slew of emails after

3     being away for a week.  I will mail it to Mr. Harris.

4          MS. SHARKEY:  Judge, I'm in the same position.  I'll

5     provide it to Mr. Cooks.

6          MR. MADIOU:  As am I, Judge.

7          MR. FASULO:  And we will as well, although we did meet

8     with the defendant and go over all --

9          THE COURT:  Look.  I'm going to ask you to get the

10     transcript to your clients pronto.  Did you all have a chance

11     to read the transcript?

12          DEFENSE COUNSEL:  Yes.

13          THE COURT:  All right.  Had you read the transcript,

14     you would have noted my insistence that the transcript be made

15     available to the defendants.  The purpose of that was to avoid

16     the need for poor Mr. McDonald to rehash here at great length

17     the architecture of the charges in the case and the discovery.

18     I'll ask you to please get those transcripts to your clients

19     immediately so that they can be up to speed on what was said at

20     that conference.

21          Is anyone here asking that I ask Mr. McDonald to

22     rehash in detail what he covered at the last conference?

23          DEFENSE COUNSEL:  No, your Honor.

24          THE COURT:  Then just briefly, for the defendants'

25     sake, let me just tell you what you will see when you see the

G1r1echc

1   transcript for those of you who have not.  I called on

2   Mr. McDonald at the initial conference with the other

3   defendants in this case and asked him to summarize all the

4   charges that were in the case, and he did that in some detail.

5   I then asked him to report on the various categories of

6   discovery, meaning evidence, that the government is in the

7   process of amassing and sharing, and he did that also in some

8   detail, and he explained that the discovery would be shared

9   with defense counsel really in a two-stage process, where

10   certain discovery would be provided by mid-January and another

11   set of discovery would be provided by mid-February.  When you

12   read the transcript, you'll see which categories of discovery

13   fall into which category.

14          In addition, I had some discussions with counsel for

15   both sides as to the physical mechanics by which defendants who

16   are incarcerated would get access to discovery in the MCC or

17   the MDC, as the case may be, and you'll find those discussions

18   helpful.

19          I encourage all of you to read those transcripts

20   because it's a very detailed description of the charges and the

21   evidence in the case, okay?

22          All right.  We have a next conference scheduled in the

23   case for March 2nd, and at that point all the defendants,

24   both the ones who are here as well as the ones who were here at

25   the first conference, will be together and so that will be an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G1r1echc

1    obvious forum to take stock of where we are and where we're

2    going.  But as long as I have you here, Mr. McDonald, let me

3    just ask you a few specific questions just to make sure that

4    we're moving efficiently.

5              MR. McDONALD:  Yes, your Honor.

6              THE COURT:  Was the government able, by the

7    January 11th deadline you had set for Phase I of discovery,

8    to provide the Phase I discovery materials to all defense

9    counsel?

10             MR. McDONALD:  Your Honor, the Phase I discovery was

11   made available to the defense counsel on that date.  Since then

12   we've been working with the discovery coordinator on the actual

13   mechanics of it.  A couple issues have arisen.  We'll just

14   inform the Court while we're here what those issues are.

15             The discovery for the first phase was voluminous.  It

16   included approximately -- over 140,000 pages of material.  It

17   also included substantial electronic material which is not

18   paginated, including pole camera data and including audio

19   recordings of certain intercepts that were intercepted under

20   Title III wiretap authority.  We also have been in the process

21   of negotiating a protective order with respect to each of the

22   defendants.  The discovery coordinator has agreed to take the

23   discovery from us and to provide it to each of the defense

24   counsel who's agreed to the protective order, while we continue

25   to negotiate the specifics of the protective order.  I expect

G1r1echc

```
1    that we'll be able to resolve any issues and we won't need to

2    trouble the Court with it.

3            THE COURT:  So let me see if I've got this right.  By

4    January 11th you were able to provide all the categories of

5    discovery that fall into Phase I to the discovery coordinator.

6    That's Ms. Greenwood.  And in effect they're uploaded

7    electronically so they can be accessed by the participating

8    defendants and defense counsel?

9            MR. McDONALD:  Ms. Greenwood doesn't have physical

10   custody of that information yet.  Just yesterday she agreed for

11   her office to take control of the uploaded drives, which we

12   expect she'll have today.

13           THE COURT:  So what was it that happened on

14   January 11th?

15           MR. McDONALD:  On January 11th we submitted an email

16   followed -- then January 12th was the letter that had the

17   pagination for each of the Bates-numbered categories of

18   documents that we would provide.  Those were made available for

19   inspection at our office for any defense counsel who wanted to

20   come take a look at it while we uploaded the documents and the

21   other material onto the drives for Ms. Greenwood.  We also

22   submitted a proposed protective order, asked for comments from

23   defense counsel.  The majority of the defense counsel agreed to

24   the protective order as written.  Ms. Greenwood had a few edits

25   to it because she wanted to make sure that she was covered by
```

G1r1echc

it.  Out of an abundance of caution, we edited it so she would
be covered by it.  Just last night we got a couple of other
responses from one additional defense counsel who's asked for
additional changes.  We didn't want that to hold up the
discovery process, so at that point Ms. Greenwood agreed that
she would take it all, that she would then undertake to provide
it to the defense counsel who had agreed to the terms of the
protective order, and our office has said that if defense
counsel would agree to undertake best efforts or agree in
concept to the protective order, we would provide the discovery
to them, recognizing that they may not have signed the
protective order yet and it wouldn't have been so ordered by
the Court.

          THE COURT:  As a practical matter, the way in which
the defendants or defense counsel are going to gain access to
the discovery here is through the electronic database
supervised by Ms. Greenwood.

          MR. McDONALD:  That's correct, your Honor.

          THE COURT:  And in effect you're basically saying it's
now under Ms. Greenwood's supervision, and as individual
defense counsel even informally signal their assent to the
protective order, they can then, working through Ms. Greenwood,
access that material.

          MR. McDONALD:  Yes, your Honor.  And I don't know if
she has it in her custody yet, but I believe that somebody from

G1r1echc

1    her office was coming around noon today to actually pick up the

2    drives.

3         THE COURT:  As to the protective order, are the terms

4    substantially the same as they were in the Trinitarios case,

5    which is the large gang case that I previously handled, or are

6    there any unusual terms specific to this case?

7         MR. McDONALD:  No, your Honor.  They're substantially

8    the same as was used in that case.

9         THE COURT:  Has any defense counsel yet raised any

10   substantive issues with the protective order or are we really

11   talking about details that need to be hashed out?

12        MR. McDONALD:  Your Honor, last night I received an

13   email from Mr. Dratel raising a few issues.  I responded to his

14   email last night.  We discussed it this morning.  I don't want

15   to speak for Mr. Dratel.  I believe that our conversation this

16   morning will either have resolved those issues or we'll be

17   close enough to having resolved those issues that we wouldn't

18   need to trouble the Court with any litigation over it.  I don't

19   want to speak for Mr. Dratel.

20        THE COURT:  If there isn't a crystallized dispute, I

21   don't need a report on the state of your negotiations, but as

22   soon as it becomes clear that there is some stumbling block

23   that's preventing an agreement, I want to be called upon to

24   referee it because I want to make sure that well before the

25   next conference, defense counsel have had meaningful access to

G1r1echc

1    as much of the discovery as they can so that the next

2    conference is as useful as possible.

3            Mr. Dratel, I see you trying to rise.

4            MR. DRATEL:  Well, just, I concur with Mr. McDonald's

5    assessment.  I think that we can work it out within the next

6    couple of days.  It's just a question of some language, and the

7    government clarified a couple of things that were satisfactory,

8    a couple of things we just have some issues with.

9            THE COURT:  Okay.  Good.  What about Phase II that you

10   had projected at the next conference was due to be provided

11   February 10th?  Are you still on track for that?

12           MR. McDONALD:  Yes, your Honor.  We are on track for

13   that.  There were two categories of discovery, or two things

14   that we had discussed as being included in Phase I which are

15   not included in what I provided to the defense counsel by

16   letter -- by email of January 11th and then letter dated

17   January 12th, which are the undercover buy reports.  For each

18   of those we're creating a chart that, because there are more

19   than 50 undercover buys, the chart will include the date of the

20   undercover buy, the defendant who we allege was involved in

21   that undercover buy, the quantity of drugs, the type of drug,

22   the amount of money paid, and whether there's audio or video

23   for that, together with the buys that were included for each

24   one.  We didn't have all of that information in our -- there

25   were a few bits and pieces of that information that we needed

14

G1r1echc

1   to track down.  We now have it all.  That's going to be

2   included in the second phase of the discovery.

3          The second category is the Northern District of New

4   York wiretap material.  I mentioned last time that there were

5   two sets of wiretaps in this case.  The first is the Southern

6   District of New York wiretap, which was a roving wiretap on the

7   cellular phones used by Marquis Wright over a three-month

8   period.  There was also a Northern District of New York wiretap

9   which was on two phones that were used by Jonathan Rodriguez.

10   We didn't have all of that material.  We do now have it and

11   we're in the process of processing it.  It's voluminous; the

12   audio files in particular.  But those will be ready to be

13   produced by the February 10th date.

14          THE COURT:  Very good.  All right.  Thank you.

15          One of the things I ordinarily raise at these

16   conferences involves practical problems that have arisen with

17   respect to, for example, the defendants' access to discovery

18   materials.  I take it, given the state of play with respect to

19   the Phase I discovery, which is to say that the counsel are

20   only getting it now as they sign on to the protective order,

21   it's premature for any problems like that to have arisen.  We

22   don't know yet whether there are any problems being presented

23   by a defendant at the MDC being unable to access on his

24   computer wiretap materials or something like that.  It's just

25   too soon.

G1r1echc

1          MR. McDONALD:  I think that's right, your Honor.  I'll

2     only say that each of these defendants is housed at the MCC.

3     We're working with the MCC, with Ms. Greenwood, and with

4     defense counsel to ensure that they would have access, even

5     after-hours access, to it in the library.  I expect that once

6     the drives, which have not yet been provided to the MCC, are

7     provided, that each of the defendants will be able to access

8     them there, but to the extent there's an issue with that, we'll

9     inform the Court.

10          THE COURT:  Look, if form follows from the prior gang

11     case that I supervised, come the second or third conference,

12     there were some issues relating to access, and it tended to be

13     Ms. Greenwood who was the one who would raise them with me, so

14     to the extent I'm able to get involved in expediting solutions,

15     I want to be.

16          All right.  Very good.  Mr. McDonald, anything else

17     you want to bring to my attention at this conference?

18          MR. McDONALD:  No, your Honor.

19          THE COURT:  All right.  Defense counsel, one of the

20     things I said at the prior conference was this:  Given the

21     scale of the case, group conferences are really not the right

22     forum for individual issues to be raised.  And from time to

23     time, in my experience, they're likely to be raised.  There

24     might or might not be a bail application, there may be an issue

25     specific to a hiccup with respect to representation, or there

G1r1echc

may be applications for the hiring of investigators, things of
that nature.  I ask that those be raised with me individually.
If it's in the nature of something that has to do with
budgeting or investigators, an application can be done in
writing, and you'll find me very quick and responsive.  If it's
something that requires a conference, as in the nature of the
bail dispute, what you should do is, along with the government,
contact my deputy to arrange a one-off conference to deal with
those issues.

          With that preface, is there anything that any counsel
wants to raise at this point?

          Yes, Ms. Sharkey.

          MS. SHARKEY:  Judge, this is all very clear.  Thank
you for repeating.  But I think my client and maybe other
clients are a little confused as to when they will have access
to the discovery and understanding that the discovery hasn't
been disclosed to their attorneys yet.  I mean, I know that I
signed off on the protected matter a while ago, and my client
has been anxious to know about the discovery, and I think we're
all tracking it because we've done this before, but I think
it's probably a little unclear.  Perhaps Mr. McDonald could
give an estimate to our clients as to when it will land at the
MCC.

          THE COURT:  Sure.  Mr. McDonald, with respect to
defendants where the lawyers have signed on to the protective

G1r1echc

1    order and you've given the discovery already to Ms. Greenwood,

2    when will that discovery be accessible to them in the MCC?

3              MR. McDONALD:  Your Honor, I don't want to speak for

4    Ms. Greenwood because she's going to collect all of the drives

5    from us and then provide them to the MCC, I believe, but I

6    don't think we'll provide the discovery to the MCC until we

7    have agreement from each counsel, at least in principle, to the

8    concept of the protective order, because I don't think we would

9    ask the Marshals to restrict the access of each defendant to

10   the discovery that's provided.

11             THE COURT:  Wait a minute.  Then we have a problem

12   where every defendant is held up in his access to the material

13   by the last defense counsel to sign on and so if one defense

14   counsel is asleep at the switch or busy on trial, none of these

15   defendants get access to the discovery material?

16             MR. McDONALD:  I take the Court's point.  I don't

17   think that's going to be an issue here, because I think we're

18   very close --

19             THE COURT:  Let me try a little differently.  I did

20   not anticipate that.  That was not at all what I had in mind.

21   It seems to me the other way to solve this is simply to say to

22   the relevant personnel at the prison, the following people are

23   cleared to get discovery because their lawyer has signed on to

24   the protective order and therefore they ought to get it.  But

25   it's not an acceptable situation in a many-defendant case for

G1r1echc

1    everyone to be dragged down by the travails of one unresponsive

2    or disputatious defense counsel.  That just doesn't work.  It's

3    not fair to everyone else.

4            MR. McDONALD:  That's a better course, your Honor, and

5    what the government will undertake to do is we'll make sure

6    that the drives, which are loaded, will be provided to the MCC

7    by the end of the week.  And we will inform the Marshals office

8    of our conversation today.  We will make sure that the Marshals

9    know which of the defendants should have access to it.  To the

10   extent there are any defendants at that point that should not

11   have access to it -- I expect that by the end of the week each

12   of the defendants will, but to the extent that that's not the

13   case, we will --

14           THE COURT:  So just to be clear, you're going to make

15   sure that by the end of the week the MCC is notified as to the

16   names of all defendants whose counsel have signed on to the

17   protective order such that as soon as Ms. Greenwood gets the

18   material loaded there, those defendants can have access.

19           Secondly, you'll be proactively in touch with the

20   defense counsel who haven't signed on to convey my urgent

21   desire that an agreement as to the protective order be reached

22   so that that defendant can gain access promptly.

23           MR. McDONALD:  Yes, your Honor.

24           THE COURT:  Are we on the same page?

25           MR. McDONALD:  Yes, your Honor.

G1r1echc

```
1         THE COURT:  Good.  Okay.  Do you have any word from

2    Ms. Greenwood as to how quickly she'll be able to get the

3    materials uploaded at the MCC?

4         MR. McDONALD:  Your Honor, I think I misspoke earlier.

5    I think actually what we're going to do is give one of the

6    drives to Ms. Greenwood, who then will make sure that each of

7    the defense counsel has access to the common discovery.  She

8    gave us all the drives, but I believe what we're going to do is

9    we're actually going to give those to the MCC.  I don't

10   actually think it's going to go to Ms. Greenwood.

11        THE COURT:  Same question then.  When will the MCC

12   have them?

13        MR. McDONALD:  They'll have it by the end of the week.

14        THE COURT:  All right.  Let's make sure that happens.

15        MR. McDONALD:  Yes.  And I expect they'll have it

16   today, your Honor, but just in case, I'd like to say by the end

17   of the week, in case there are any technological issues that

18   have come up over the last couple hours that I'm not aware of.

19        THE COURT:  Thank you.  One thing I said in the

20   transcript last time was that I encouraged the government to be

21   proactive in communicating to individual defense counsel what

22   parts of this massive discovery are uniquely relevant to their

23   client, simply because, as a matter of user friendliness, it's

24   not realistic to ask counsel to go through 140,000 pages and

25   then find Waldo.  So I want government counsel to highlight for
```

G1r1echc

1    defense counsel, without limiting yourself, what appears to be

2    most relevant, what the critical events were, buy busts or

3    whatever they are, so that defense counsel can, as promptly as

4    possible, begin to assess the most consequential discovery for

5    their client.

6                THE Ms. Sharkey, does that respond to your concern?

7                MS. SHARKEY:  Yes, it does.  Thank you.

8                THE COURT:  Mr. Fasulo?

9                MR. FASULO:  Thank you, Judge.  Everything is clear to

10   me.  Just to be clear on the record on behalf of my client that

11   we, the lawyers here, currently do not have the discovery so we

12   are not able to share with them yet the discovery, and as soon

13   as we have it, which could be within the next week or so, as

14   soon as Ms. Greenwood, who is getting it today, gets it to us,

15   we will also share what we have with them, just so we're on the

16   same page.

17               THE COURT:  Have you signed the protective order?

18               MR. FASULO:  I have, Judge, yes.  I did early on.

19               THE COURT:  Any other defense counsel have anything

20   you want to raise with me while we're all here together?

21               MR. DRATEL:  No, your Honor.  Thank you.

22               THE COURT:  All right.  I excluded time globally,

23   including the absent defendants, through March the 2nd, but

24   just for the record, am I correct that there is no defense

25   counsel who objects to my exclusion of time, given all the

G1r1echc

| | |
|---|---|
| 1 | valid things that need to happen between now and then, |
| 2 | including beginning your review of discovery? |
| 3 | MR. PARKER:  You are correct. |
| 4 | MR. DRATEL:  Correct, your Honor. |
| 5 | MS. SHARKEY:  Yes. |
| 6 | MR. FASULO:  Yes.  And for the record, I discussed it |
| 7 | with my client as well. |
| 8 | MR. MADIOU:  Correct. |
| 9 | THE COURT:  I put on the record last time the |
| 10 | following as well:  I asked whether any defendant was at that |
| 11 | time seeking a trial date.  There was a resounding silence. |
| 12 | For the record, is there any defense counsel at this point |
| 13 | seeking a trial date? |
| 14 | DEFENSE COUNSEL:  No. |
| 15 | THE COURT:  All right.  Is there anything that anyone |
| 16 | wants to raise today before we adjourn? |
| 17 | MS. SHARKEY:  No, your Honor.  Thank you. |
| 18 | THE COURT:  All right.  Thank you.  Look, I appreciate |
| 19 | everyone's performance of their duties.  Government, I |
| 20 | appreciate the detail in which you laid out the case last time |
| 21 | and that you're doing your best to get these phases of |
| 22 | discovery to defense counsel promptly.  Please be as proactive |
| 23 | as you can in making sure that defense counsel sign off on a |
| 24 | protective order and that the material be given both to |
| 25 | Ms. Greenwood and to the relevant jail ASAP. |

G1r1echc

1          Defense counsel, I appreciate your good questions

2     today and your getting out of the gate quickly in this large

3     case.

4          Thank you.  We stand adjourned.  I'll see all of you

5     on March the 2nd.

6          ALL COUNSEL:  Thank you, your Honor.

7                              o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25